Date signed April 23, 2012



**PAUL MANNES**
**U. S. BANKRUPTCY JUDGE**

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
### at Greenbelt

|  |  |  |
|---|---|---|
| IN RE: | : | |
| | : | |
| RGHGAB AT FREDERICK, LLC | : | Case No. 11-10627PM |
| | : | Chapter 7 |
| Debtor | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |
| MICHAEL G. WOLFF, TRUSTEE | : | |
| Plaintiff | : | |
| vs. | : | Adversary No. 11-0346PM |
| | : | |
| WAVERLY VIEW INVESTORS, LLC | : | |
| ROCKY GORGE DEVELOPMENT, LLC | : | |
| Defendants | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |

### MEMORANDUM OF DECISION

This case comes before the court on the claim pursued, through the auspices of the Trustee, of the minority holder of the stock of the Debtor, RGHGAB at Frederick, LLC ("RGHRAB"), for equitable subordination or equitable disallowance of the claim of Waverly View Investors, LLC[1] ("Waverly"), pursuant to 11 U.S.C. § 510(c). The cast of characters includes Christopher Dorment ("Dorment"), the Chairman and Sole Member of Rocky Gorge Development, LLC ("Rocky Gorge"), Robert Berman ("Berman"), the President of GAB Enterprises, Inc. ("GAB"), his father, Malcolm Berman, and Waverly, the present holder of a secured claim in the sum of $9,642,437.46 sought to be subordinated. Dorment caused the formation of Waverly in June 2010 to acquire the secured obligation held by Branch Banking and Trust Company ("BBT"). following what Christopher Dorment viewed as a default on the part of GAB. This dispute was combined for hearing with an Amended Motion for Relief from

the Automatic Stay filed by Waverly seeking to enforce the indemnity deed of trust acquired from BBT.  Plaintiff also seeks disallowance of the 80% membership interest held by Rocky Gorge in the Debtor.  While there were considerable differences in the testimony as to various factual matters and the conclusions to be drawn therefrom, there was no dispute that the Debtor's interest in the subject property was worth $5-6 million less than the amount owed to the holder of the note, whoever that might be.

Debtor was created on November 11, 2003, to implement an Operating Agreement (D. Ex. 1) dated November 10, 2003.  The Agreement concerned the terms for acquiring, developing and selling nine parcels of real property in Frederick County, Maryland..  Under this Agreement the parties were to develop what has been referred to as the Shookstown Road property.  The parties contributed their contract rights in the subject property with future expenses to be shared 80% by Rocky Gorge and 20%  by GAB.  The signatories were to execute guaranties as required.  But the matter got off on the wrong foot when BBT required, in addition to the Members' guaranties, the personal guaranty of Dorment on the obligation (hereafter the "Note").

Throughout life of the agreement, the relationship between Berman and Dorment was acrimonious and marked by ongoing disputes almost from the start.  The history of this relationship is well summarized in Plaintiff's Proposed Findings of Fact.

The Agreement contemplated that the project would be financed by borrowed funds and member loans.  In keeping with this obligation, Rocky Gorge executed a promissory note on January 30, 2004, for $2.75 million, later increased to $8.95 million on September 12, 2007.  These obligations were guaranteed by Dorment personally and GAB to a limited extent.  The balance of funding required was to be made by capital calls upon the parties.  The remedy for a failure of a member to commit funds was limited by Section 5A of the Agreement, an elaborate procedure requiring notice and cash contributions by the non-defaulting member, including buying out the defaulting member or diluting its interest.  Dorment did not avail himself of any of these remedies after any of the alleged defaults by Berman.  The project ran into the hurricane of the recent momentous downturn in the real estate market in Frederick County and elsewhere.  The property was so far undersecured, that is, by at least $5-6 million, that there was no economic reason to hang onto it in the absence of a concession from the secured lender.  With no income coming into the partnership, the Debtor was running out of funds.  The partners were left to their own resources.  Calls were made upon Robert Berman to share in contributions.  Berman testified that he did not make these calls as it was not prudent to do so with the loan being in

default. He refused and suggested instead the possibility of funding by his father. However, the terms and conditions that were to be imposed by Malcolm Berman were never disclosed or ever committed to writing. Dorment testified that what he had heard about Malcolm Berman made him very reluctant to enter into any arrangement with him without well defined terms committed to writing. Dorment was on his own to procure the funds required to run the project. At all times Robert took the position that it was Dorment's duty under Section 2.2.2. of the Operating Agreement to provide the financing. ("Rocky Gorge shall be responsible for obtaining and/or providing equity investments, institutional and/or private financing, working capital, deposits and guaranties [the Financial Resources], necessary to permit the Company to carry out its business.") However, when the situation became critical, Rocky Gorge could not either supply funds on its own account or obtain the necessary funds "on commercially reasonable terms," as required for such acts by Section 2.2.2 of the Operating Agreement. Faced with almost certain foreclosure and enforcement of his personal guaranty, Dorment sought the opportunity to purchase the Note for $2.4 million, later reduced to $2 million, leaving the door open for Macolm Berman to make a similar offer that never crystallized. At all times Dorment advised Robert Berman of the situation facing the venture. This was required in that Section 5.3 of the Operating Agreement required his agreement to dissolve or terminate the venture, to do anything in contravention of the agreement, to do any act that would make it impossible to carry on the ordinary business of the venture, or to possess or assign rights in company property or assign rights in company property other than for a company purpose.

By a letter dated November 12, 2009 (P. Ex. 8), Dorment advised Berman of his intention to buy the BBT Note at a discount and that he was seeking fresh equity capital and that this would require ceding of control of the project and dilution of their equity stakes. How he could cede control of the project without the consent of Berman is unclear. Dorment acknowledged the inability of Rocky Gorge to fulfill its financing responsibility. The parties met on February 3, 2010, to discuss the critical situation. Dorment proposed a Strategic Plan (P. Ex. 11) noting the impossibility of progressing under the Operating Agreement and with the goal of salvaging what they could from the project but primarily to avoid liability under their guaranties. The latter was of no importance to Berman as, unlike Dorment, he had no personal responsibility for the debt. Various options were mentioned, including a buy-sell agreement leaving one of the warring partners in total control. The document concluded that the only practical course of action would be for a new entity to buy the BBT Note, and "if the Managing Member reaches

that conclusion, the Managing Member would proceed ahead with the goal of protecting the interests of the Company even if the minority member objected." The court finds as a fact that the primary motivation of Dorment was to limit his liability on the guaranty and secondarily to protect the venture.

In order to buy time, Dorment entered into negotiations for a forbearance agreement with BBT dated March 30, 2019 (P. Ex. 19). Although all that this would have involved was for his shell corporation to sign a guaranty, Berman, true to his uncooperative nature, refused to sign the agreement. The agreement was consummated without his signature, and during the period of the forbearance the parties had another quarterly meeting in May. The parties discussed their situation, mutual buy-outs and other resolutions of the situation. At this point, Malcolm Berman took a role in the proceedings with an initial view of GAB buying out Dorment and purchasing the Note, provided that Dorment stayed active in the project. Malcolm Berman then met with the zoning lawyer and the engineer and, following these meetings, ultimately stated that he was only interested in providing "friendly financing" to the Debtor. Malcolm Berman then called BBT's attorney to see the price at which he could buy the Note. At about this time, Rocky Gorge obtained the exclusive right to purchase the Note. Another 45-day extension of the Note was obtained by Rocky Gorge in exchange for a $75,000.00 deposit.

On July 1, 2010, Dorment met with the Bermans at Clyde's Restaurant in Columbia. The purpose of the meeting was to discuss the terms by which Malcolm Berman would buy the Note. At no time did Malcolm discuss anything but generalities and never was anything put in writing by him in regard to his advancing money for the project. Following the meeting, Dorment sent Malcolm a Term Sheet that he found unacceptable.

On August 6, 2010, Dorment received a commitment from Capital Bank to enable him and his associates in Waverly to purchase the Note from BBT (P. Ex. 46). Dorment and his wife were to be guarantors as a condition of the commitment, and the obligation to Capital Bank was to be further secured by the Note. Following receipt of the commitment, Dorment obtained a further extension to September 13, 2010. The purchase price was reduced to $2,000,000.00. Dorment then disclosed to Berman that the Note would be purchased by Waverly, inasmuch as Rocky Gorge lacked the capacity to buy it (P. Ex. 45B). After assignment by Rocky Gorge to Waverly of the note purchase agreement with Capital Bank, the transaction closed on September 17, 2010. While Berman states that he was never informed of Waverly's intention to foreclose on the property after acquisition of the Note, the court finds it hard to believe that he did not

foresee that possibility as the only sure way of breaking the logjam that the partners were in. Here again, while no one disputes the financial ability of Malcolm Berman to be a white knight in this transaction, there never was any publication of a definitive statement of the terms that he would extract for his funding.

Following the closing, Dorment began acting for Waverly as if it owned the subject property, entering into letters of intent and contracts with national builders.  At the same time, he signed a Deed of Easement on behalf of the Debtor.  Waverly's foreclosure action, said to have been scheduled for January 11, 2011, was interdicted by the involuntary bankruptcy petition filed at 4:43 p.m. that day.

The court finds a total absence of harm by the actions complained of to the one creditor holding a secured claim or the six holders of claims without priority.  Without actual harm to creditors, there is no basis for the cause of action.  *In re Kreisler*, 546 F.3d 863, 866-867 (CA7 2008).  The absence of any harm caused by the note acquisition is demonstrated by the fact that this project was so far indebted to the holder of the secured claim that there was no scenario under which the Trustee's constituent body, the holders of unsecured claims, could receive any distribution whatsoever.  Rocky Gorge might have a fiduciary relationship to GAB, but that is not what this adversary proceeding concerns.  Similarly, were there equity available for distribution after payment of the secured claim, GAB might well have a valid claim for subordination of the Rocky Gorge claim, and the Trustee might have a cause of action against both Rocky Gorge and GAB to recharacterize their member loans as camouflaged equity under the authority of such cases as *In re Airadigm Communications, Inc*., 616 F.3d 642 (CA7 2010), but there is no basis for disallowance of the secured claim.  To do so would create a windfall for GAB, the real party in interest in this adversary proceeding .

Plaintiff seeks recovery pursuant to the principle of equitable subordination, a remedy provided by 11 U.S.C. § 510(c):

**11 U.S.C. § 510.  Subordination**

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may--
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> (2) order that any lien securing such a subordinated claim be transferred to

the estate.

It is a core proceeding under 28 U.S.C. § 157(b)(2)(K) that must be brought by way of an adversary proceeding pursuant to Fed. Rule of Bankruptcy Proc. 7001(8). As pointed out in *In re ASI Reactivation, Inc.*, 934 F.2d 1315, 1321-1322 (CA4 1991):

> Generally, equitable subordination involves a number of inquiries: 1) whether the claimant engaged in fraudulent conduct, 2) whether the conduct resulted in injury to creditors and 3) whether subordination would be consistent with other bankruptcy law. See Holt v. Federal Deposit Ins. Co. (In re CTS Truss, Inc.), 868 F.2d 146, 148 (5th Cir.1989) (assuming arguendo bank's conduct was attributable to FDIC, conduct did not fall within classic pattern warranting extraordinary remedy of equitable subordination); Wilson v. Huffman ( In re Missionary Baptist Foundation of America, Inc.) 712 F.2d 206, 212 (5th Cir.1983) (bankruptcy court must make explicit findings on each of the three elements when granting equitable subordination); Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692, 699-700 (5th Cir.1977) (as court of equity, bankruptcy court may subordinate claim if three conditions are met). As to purchase of the secured note, there was simply no evidence that it was either fraudulent or injurious. The record indicates Narayanan used his own funds to buy the note. *There is nothing in the bankruptcy act which per se forbids a principal from obtaining and asserting rights as a lien creditor.* Here there is also evidence that Narayanan bought the note to stave off a foreclosure, for the company's benefit, as well as to solidify his position. If some particular creditor was deceived into dealing with this corporation by this transaction, that was not demonstrated. Thus, the debt underlying the note and the lien were properly recognized by the bankruptcy court. (Emphasis added.)

Again, the court finds that no harm was caused to the creditor body by Dorment forming a group to acquire the Note in and of itself. There could well be a cause of action in what is essentially this two-party dispute between Robert Berman and Christopher Dorment operating through their legal entities. But resolution of the potential dispute is for another day in another jurisdiction.

The court must now deal with the Trustee's claim for disallowance of the claim of Waverley View Investors, LLC, the holder and transferee of the Note. This doctrine was described in *Pepper v. Litton*, 308 U.S. 295, 304-305 (1939). While there is a difference of opinion as to whether this action survived the passage of the Bankruptcy Reform Act of 1978, the court will assume for the purpose of this opinion that the cause of action still is viable. See *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B. R. 64, 74-76 (BC S.D.N.Y. 2008). In any event, the action has been described as being available only "in extreme instances–perhaps very rare–where it is necessary as a remedy . . . ." *Adelphia Recovery Trust v.*

*Bank of America, N.A.*, 390 B.R . 80, 99 (S.D.N.Y. 2008).  The court explained in describing equitable subordination:

> "The purpose of equitable subordination is to undo wrongdoing by an individual creditor in the interest of the other creditors." *In re Applied Theory Corp.*, 345 B.R. 56, 59 (S.D.N.Y.2006) (*citing In re Lockwood*, 14 B.R. 374, 380–81 (Bankr. E.D.N.Y.1981) ("The fundamental aim of equitable subordination is to undo or offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of bankruptcy results.")).  It follows reasonably from the judicial and legislative interpretations of the statute that the "other creditors" whose welfare is the primary focus of equitable subordination law must be creditors of the same debtor, as a given claim may not be subordinated to an equity interest, but only to another claim.

The Note was acquired for two purposes, to gain control of the subject property for the benefit of the new combine and to relieve Dorment of the weight of a $9 million plus guaranty. The court finds nothing in the nature of inequitable conduct or unfairness on Dorment's part. The creditors, as creditors as explained above, were then at least $5million under water and suffered no change in position as a result of the transfer of the Note to parties friendly to Dorment.  Berman, as a partner-creditor, may have a claim against his co-venturer.  However, the court finds nothing in the behavior of Dorment or his co-venturers in Waverley to mandate the  awesome punishment of equitable disallowance being imposed on them.  As explained in the case of *In re Official Committee of Unsecured Creditors for Dornier Aviation (North America) Inc.,* 453 F.3d 225, 232 (CA4 2006):

> Like disallowance, equitable subordination also differs markedly and serves different purposes from recharacterization. While a bankruptcy court's recharacterization decision rests on the substance of the transaction giving rise to the claimant's demand, its equitable subordination decision rests on its assessment of the creditor's behavior. As the Tenth Circuit has explained, when a claim is equitably subordinated, "[t]he funds in question are still considered outstanding corporate debt, but the courts seek to remedy some inequity or unfairness perpetrated against the bankrupt entity's other creditors or investors by postponing the subordinated creditor's right to repayment until others' claims have been satisfied." *Sender v. Bronze Group*, *Ltd.* (*In re Hedged-Invs. Assocs., Inc.*), 380 F.3d 1292, 1297 (10th Cir.2004); see also id. ("The doctrine of equitable subordination, by contrast, looks not to the substance of the transaction but to the behavior of the parties involved."). Thus, although recharacterization and equitable subordination lead to a similar result, they "address distinct concerns" and require a bankruptcy court to conduct different inquiries. *See Cohen v. KB Mezzanine Fund II, LP* (*In re SubMicron Sys. Corp.*), 432 F.3d 448, 454 (3d Cir.2006).  In the case at hand, the bankruptcy court found that equitable subordination was inappropriate because there was no evidence of GMBH

engaging in inequitable conduct.  This finding does not in any way affect the court's conclusion that recharacterization was appropriate.[2]

The final matter before the court is the motion of Waverly for relief from the automatic stay of 11 U.S.C. § 362(a).  The opposition to the motion was based on the proposition that a favorable result on the adversary proceeding would moot the motion, and, in view of the absence of equity in the subject property, the motion for relief from stay is granted.  Counsel for Waverly shall present an appropriate order terminating the stay.

_____

**END NOTE**

1.  In this record there are two spellings of the name of this Defendant.  Plaintiff uses "Waverly" and Defendant uses "Waverley."  The court will use the Plaintiff's spelling.

cc:
Michael G. Wolff, Trustee, 15245 Shady Grove Road, Suite 465, Rockville, Md 20850
G. David Dean II, Esq., 300 E. Lombard Street, Suite 2000, Baltimore, MD 21202
Jeffrey M. Orenstein, Esq., 15245 Shady grove road, Suite 465, Rockville, MD 20850
Gabrielle M. Duvall/Jennifer Kneeland, 7200 Wisconsin Avenue, #800, Bethesda, Md 20814
United States Trustee, 6305 Ivy Lane, #600, Greenbelt  MD  20770

**End of Memorandum**